# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

JEFFREY L. JADWIN,

      Plaintiff,

                              **Civil Action 2:18-cv-00271**
                              **Judge Sarah D. Morrison**
      v.                        **Chief Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Jeffrey L. Jadwin ("Plaintiff"), brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Social Security Disability Insurance benefits ("SSDI") and Supplemental Security Income benefits ("SSI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 13), and the administrative record (ECF No. 7). Plaintiff did not file a Reply. For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.  BACKGROUND

Plaintiff applied for disability benefits and supplemental security income on May 13, 2014. (R. at 208.) Plaintiff's claim was denied initially and upon reconsideration. (R. at 1–6.) Upon request, a hearing was held on February 6, 2017, in which Plaintiff, represented by

counsel, appeared and testified. (R. at 45–73.) A vocational expert also appeared and testified at the hearing. (R. at 67–71.) On March 31, 2017, Administrative Law Judge Jeffrey Hartranft ("the ALJ") issued a decision finding that Plaintiff was not disabled at any time after January 2, 2014, the alleged onset date. (R. at 12–26.) On January 31, 2018, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–6.) Plaintiff then timely commenced the instant action. (ECF No. 3.)

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that he lived with his wife and dog in a trailer. (R. at 52–53.) Plaintiff further testified that he had a thirty-four-year old daughter. (R. at 52.) Plaintiff stated he had a driver's license and "sometimes" drove to go to the store, but his wife drove to the hearing. (R. at 53.) When asked if he had problems driving, Plaintiff responded that he gets distracted more than he used to. (*Id.*) Plaintiff testified that his wife is disabled so she does not work outside of the home. (*Id.*) Plaintiff stated that he was six-foot tall and weighed "probably about" two-hundred and twenty pounds. (R. at 51–52.) Plaintiff further stated that he is a high school graduate, used to have a commercial driver's license, and never had any professional certifications. (R. at 53–54.)

Plaintiff testified that he thought the last time he worked was in April 2014 building specialty doors for Jeld-Wen Doors. (R. at 54.) Plaintiff further testified that he had to lift "around" one-hundred pounds in that job. (R. at 55.) Plaintiff stated that he worked at Jeld-Wen Doors for seven years and stopped because he "just couldn't do it anymore." (R. at 55–56.) Plaintiff stated he also worked at a clay mine in "2002, something like that," where he drove a rock truck and ran a grinder and front-end loader. (R. at 56, 58.) Plaintiff further stated he

worked at the clay mine for "about a year."  (R. at 57.)  Between his time working at the clay mine and Jeld-Wen Doors, Plaintiff testified that he worked at Hocking Athens Perry Community which involved flood control.  (R. at 58.)  Plaintiff stated that in that position he ran a chainsaw to cut trees that fell in creeks and at times had to lift around one-hundred-and-fifty pounds.  (R. at 58–59.)  Plaintiff further stated he worked in that position for six months.  (R. at 58.)

After discussing his job history, Plaintiff testified that he believes he cannot work due to having no energy.  (R. at 59.)  Plaintiff further testified that he gets out of bed at noon and by two in the afternoon he "feel[s] like [he] need[s] to lay down because [he] just [doesn't] have the energy."  (R. at 60.)  When acknowledging his cirrhosis, Plaintiff testified that he drank "a little bit" but "wasn't no big drinker."  (*Id.*)  Plaintiff further testified that he no longer drinks, and that he stopped drinking when he found out he had cirrhosis of the liver.  (*Id.*)  Before that, Plaintiff indicated he was drinking "probably" a six-pack of beer a week.  (*Id.*)

Plaintiff testified that besides fatigue he also experiences nausea.  (R. at 61.)  Plaintiff stated that he gets sick and pukes, and when that happens it "makes [him] even weaker."  (*Id.*)  Plaintiff further stated he might "go a couple months" without this occurring, but then it will happen all the sudden and he is "down for a week" and that this will happen at least a couple times a year.  (R. at 60, 64.)  When acknowledging his hemochromatosis, Plaintiff testified that he is phlebotomized[1] as treatment.  (R. at 60.)  Plaintiff further testified that he is phlebotomized "whenever ferritin levels get to a certain point."  (*Id.*)  Plaintiff stated that the last time he was phlebotomized was "probably" about a year ago.  (*Id.*)

---

[1] Phlebotomized indicates having blood drawn.  (R. at 61.)

Plaintiff next testified about his mental health issues.  (*Id.*)  Plaintiff stated he went to Six County, Inc. for anger issues.  (R. at 61–62.)  Plaintiff explained his anger as "things make [him] mad a lot easier than it used to" and that he was "not as patient as [he] used to be."  (R. at 62.)  Plaintiff stated that "bad drivers" and "people [who don't] do their job" make him angry.  (R. at 66.)  Plaintiff also stated he has a hard time sleeping sometimes.  (R. at 62.)  Plaintiff also testified that he has problems with concentration and that he will "be talking about one thing and digress for 20 seconds and try [to] get back to what [he] was talking about, and [he] forget[s] what [he was] talking about."  (R. at 65.)

Plaintiff testified that in a typical day he gets up, takes his medicine, sits down and watches television until he gets tired, and then lays down to sleep for a while.  (R. at 63.)  Plaintiff further testified that when he wakes up he will get something to eat and watch television again until he goes to bed.  (*Id.*)  Plaintiff stated that he thought he napped at least three hours a day.  (R. at 64.)  Plaintiff testified that he experiences cramping in his hands and swelling in his abdomen, ankles, feet, legs, and heart.  (R. at 65–66.)

## B.  Vocational Expert Testimony

George W. Coleman III testified as the vocational expert ("VE") at the February 2017 hearing.  (R. at X, 195.)  The VE testified that Plaintiff's past work included assembler/subassembler, a medium strength level, semi-skilled job, heavy as performed; grinder/miller, a medium strength level, semi-skilled job, medium as performed; front-end loader, a medium strength level, semi-skilled job, medium as performed; and construction worker II, very heavy strength level, unskilled job, very heavy as performed.  (R. at 67–68.)

The ALJ asked the VE to assume that Plaintiff was capable of working at the light exertional level; could frequently climb ramps or stairs but not ladders, ropes, or scaffolds; was

capable of occasional stooping; would need to avoid concentrated exposure to extreme heat and cold, excess humidity, and wetness as well as excessive vibration and exposure to work place hazards such as unprotected heights and machinery; was capable of simple, routine, and repetitive tasks involving only simple work-related decisions with few, if any, work place changes; could work at occupations that did not require strict production quotas or fast-paced work; and could work in occupations which did not require interaction with the general public and only occasional interaction with coworkers and supervisors. (R. at 68–69.) Assuming all of these limitations, the VE testified that Plaintiff would not be capable of any of his past work. (R. at 69.)

Assuming a hypothetical individual with Plaintiff's educational and vocational background, along with the restrictions in the previous question, the VE testified that the individual could perform work at light, unskilled levels, including the jobs of office helper, clerical assistant, cafeteria attendant, and mail room clerk. (R. at 69–70.) The ALJ asked the VE about an employer's tolerance for being off task in unskilled employment. (R. at 70.) The VE testified that it would be up to between ten and twelve percent over an eight-hour work period. (*Id.*) The VE further testified that in his experience the tolerance for absenteeism in unskilled work was a half a day to a day per month. (R. at 71.)

### III. MEDICAL RECORDS

**A.    Physical Impairments**

**1.    Jeffrey Haggenjos, D.O.**

Plaintiff saw his primary care physician, Dr. Haggenjos in April 2014 for follow-up after a hospital admission. (R. at 403–10.) During this follow-up visit, Plaintiff reported feeling fatigue, nausea, and dizziness after moving. (R. at 403.) Dr. Haggenjos noted that Plaintiff

suffered from NASH (nonalcoholic steatohepatitis), referred him to Nephrology, and prescribed him medication.  (R. at 407.)

On May 14, 2014, Plaintiff saw Dr. Haggenjos for follow-up after a hospital admission. (R. at 478–84.)  Plaintiff complained of swelling in his feet and abdomen, depression, and requested a refill of Tramadol.  (R. at 478.)  Dr. Haggenjos listed Plaintiff's diagnoses as electrolyte imbalance; HTN (hypertension); cardiac arrhythmia; abdominal pain, other specified site; smoking; weight loss; CAD (coronary artery disease); nausea; thrombocytopenia; NASH (nonalcoholic steatohepatitis); and CRF (chronic renal failure), unspecified stage.  (R. at 481–82.)  Dr Haggenjos prescribed a variety of medications.  (R. at 482.)

On June 25, 2014, Plaintiff returned to Dr. Haggenjos due to an edema of his lower legs. (R. at 538–43.)  Plaintiff also complained of pain and swelling in his lower back.  (R. at 538.) Dr. Haggenjos prescribed Plaintiff albuterol and recommended that he quit smoking.  (R. at 541.) Also in June 2014, Dr. Haggenjos completed a questionnaire on behalf of the state agency in which he opined that Plaintiff was unable to work.  (R. at 475–77.)  An x-ray of Plaintiff's lumbar spine taken in July 2014 showed mild lumbar spondylosis.  (R. at 546.)

On October 7, 2014, Dr. Haggenjos completed a medical source statement in which he determined that Plaintiff could lift and carry ten pounds on an occasional basis; less than ten pounds on a frequent basis; and stand/walk about two hours per day and sit for six hours per day. (R. at 650–51.)  Dr. Haggenjos opined that Plaintiff needed the opportunity to shift from sitting to standing/walking at will and would sometimes need to lie down at unpredictable intervals during an eight-hour working shift.  (R. at 651.)  Dr. Haggenjos further opined that Plaintiff could never crouch, squat or climb ladders, and could rarely twist, stoop (bend), or climb stairs. (*Id.*)  Additionally, Dr. Haggenjos opined that Plaintiff's fingering (fine manipulation), handling

(gross manipulation), and feeling were affected by his impairment, but his reaching (including overhead) and pushing/pulling were not affected. (*Id.*) Dr. Haggenjos indicated that Plaintiff should avoid all exposure to extreme cold, extreme heat, high humidity, wetness, cigarette smoke, perfumes, soldering fluxes, solvents/cleaners, fumes/odors/gases, dust, and chemicals. (R. at 652.) Dr. Haggenjos noted that Plaintiff is unable to handle stress and is likely to miss more than four days of work per month. (R. at 652.)

### 2. Genesis HealthCare

In January 2014, Scott Wegner, M.D. evaluated Plaintiff for thrombocytopenia. (R. at 348–51.) Dr. Wegner noted that Plaintiff did not suffer from any abnormal bleeding or thrombotic events. (R. at 350.) Dr. Wegner indicated that Plaintiff's recent lab work was positive for Hepatitis C and his thrombocytopenia is likely a consequence of Hepatitis C. (R. at 348–49.) Dr. Wegner recommended that he undergo weekly therapeutic phlebotomies to reach his target ferritin level. (R. at 349.) Dr. Wegner also discussed smoking and tobacco cessation with Plaintiff. (R. at 348.)

Plaintiff was admitted to the hospital on April 21, 2014, complaining of abdominal pain and hypertension. (R. at 397.) Plaintiff was sent to the emergency department by Dr. Haggenjos for evaluation because his blood pressure was 260/110. (R. at 373.) At Dr. Haggenjos' office, Plaintiff reported he had been feeling "out of sorts" for a couple of days. (*Id.*) He also complained of some left-sided abdominal pain. (*Id.*) Dr. Haggenjos noted that there was no associated nausea, vomiting, fever, diarrhea, or constipation. (*Id.*) In the emergency department, Plaintiff's blood pressure was 210/190. (*Id.*) A CT of Plaintiff's abdomen showed findings compatible with hepatic cirrhosis, as well as moderate ascites, however there was no evidence of aortic dissection or aneurysm. (R. at 390.)

Plaintiff was again admitted to the hospital in May 2014, due to elevated creatinine. (R. at 419.) Regarding Plaintiff's liver disease, the emergency room physician found his abdomen to be soft and a fluid wave was not detected. (*Id.*) The emergency room physician noted that Plaintiff had been on Lasix and ACE inhibitor therapy and he had acute renal failure likely due to the combination of both and therefore needed to have adjustments made in his medication. (*Id.*) In September 2014, Plaintiff presented to the emergency department complaining of high blood pressure, headache, and nausea. (R. at 564–65.) An x-ray of Plaintiff's chest indicated mild cardiac enlargement. (R. at 566.)

### 3.   William Salt, M.D.

In June 2014, Plaintiff was evaluated by Dr. Salt, a gastroenterologist, at the request of Dr. Haggenjos. (R. at 471–74.) Plaintiff reported he suffered from dyspnea with exercise, leg/ankle swelling, palpitations, fatigue, weight loss, cold intolerance, abdominal pain, abdominal swelling, gas, nausea, vomiting, easy bruising, back pain, muscle weakness, stiffness, anxiety, and depression. (R. at 472.) Dr. Salt noted that Plaintiff exhibited widespread gray skin psoriasis. (*Id.*) Furthermore, Dr. Salt opined that Plaintiff was a "poor historian." (*Id.*) Dr. Salt concluded that "[i]t is clear that [Plaintiff] is chronically ill with liver disease and needs to be evaluated at a liver transplantation center." (R. at 473.)

### 4.   OSU - Department of Gastroenterology, Hepatology and Nutrition

Joshua Peck, M.D. saw Plaintiff in February 2015 for follow-up regarding his liver disease. (R. at 653.) Dr. Peck noted that Plaintiff reported he was "doing very well" since last being seen. (*Id.*) Dr. Peck recommended continuing with esophageal variceal screening every one to two years and adherence to a strict two gram, low sodium diet. (R. at 655.) Also in February 2015, Douglas Levin, M.D. indicated that Plaintiff's creatinine levels were

"considerably better" and that he was heterozygous for the C282y gene "suggesting his iron levels reflect the hepatitis C and alcohol." (R. at 671.) In May 2015, Plaintiff reported to Dr. Peck that he had not gained anymore weight and did not believe he had an increase in swelling. (R. at 931.) Dr. Peck recommended that Plaintiff undergo an MRI as soon as possible and continue with the esophageal variceal screening and low sodium diet. (R. at 933–34.) In March 2016, Plaintiff saw Anthony Michaels, M.D. for a follow-up. (R. at 977.) Plaintiff denied having any new medical problems or hospitalizations since his previous clinic visit. (*Id.*) Dr. Michaels recommended screening every six months because of Plaintiff's cirrhosis. (R. at 978.)

### E. State Agency Review

In July 2014, after reviewing Plaintiff's medical record, Maria Congbalay, M.D., opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; stand/walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (R. at 83.) Dr. Congbalay also found Plaintiff could frequently climb ramps/stairs; occasionally stoop (bend at the waist); and never climb ladders, ropes, or scaffolds. (*Id.*) Dr. Congbalay further found that Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and fumes/odors/dusts/gases/poor ventilation/etc. (R. at 84.) Moreover, Dr. Congbalay indicated Plaintiff should avoid moderate exposure to hazards such as machinery and heights. (*Id.*) In March 2015, Diane Manos, M.D. reviewed the record upon reconsideration and affirmed Dr. Congbalay's assessment. (R. at 119–21.)

### B. Mental Impairments

#### 1. Six County, Inc./Steven Scrimenti, Ph.D.

Plaintiff presented to Six County, Inc. for a mental health assessment with licensed psychologist, Dr. Stephen Scrimenti, in April 2015. (R. at 714–22.) Plaintiff reported that his

primary problem was anger, but he also had difficulty with depression and anxiety. (R. at 714.) Dr. Scrimenti noted that there was no evidence of suicidal or homicidal ideations or actions, mania, violence, psychosis, or substance abuse. (*Id.*) On mental status examination, Dr. Scrimenti found Plaintiff to be physically unkempt with poor hygiene, slumped in posture, slowed in general body movements, and soft in amplitude/quality of speech. (R. at 717.) Dr. Scrimenti diagnosed impulse control disorder and anxiety disorder. (R. at 720.)

In July 2015, Plaintiff related problems related to anger and depression. (R. at 729.) Dr. Scrimenti noted their session focused on normal versus abnormal anger and that Plaintiff's depression appears to be solely mood based with no self-denigration. (Id.) On August 13, 2015, Plaintiff indicated he had no problems with anger since his last session. (R. at 731.) Plaintiff reported the same on September 3, 2015. (R. at 733.) On September 17, 2015, Plaintiff reported problems with depression and anger, but none with anxiety. (R. at 735.) Dr. Scrimenti noted that Plaintiff's "depression is occasional, and tends to be focused on the realistic possibility of a liver transplant." (*Id.*) On October 29, 2015, Plaintiff reported no current problems with anger, but indicated he was experiencing some depression "including the anticipation of difficulty with the upcoming winter ([d]ue to weather limitations on his activity level)." (R. at 739.)

On November 19, 2015, Plaintiff reported he had been controlling his anger. (R. at 964.) Dr. Scrimenti noted that Plaintiff appeared somewhat tired and depressed. (*Id.*) On December 10, 2015, Plaintiff reported no anger problems, but Dr. Scrimenti noted he still presented with depression and anxiety at times. (R. at 966.) On January 7, 2016, Plaintiff reported some slight depression. (R. at 968.) On January 28, 2016, Dr. Scrimenti noted that Plaintiff continued to manage his moods and anger relatively well. (R. at 970.) On February 11, 2016, Dr. Scrimenti noted Plaintiff had been managing his anger, but that his depression fluctuates. (R. at 972.) Dr.

Scrimenti also noted that Plaintiff considered his anti-depressant helpful. (*Id.*) On February 25, 2016, Dr. Scrimenti noted that Plaintiff was managing his moods but was "very concerned relative to world events." (R. at 974.) On March 31, 2016, Plaintiff reported some mood and physical fluctuations but no anger concerns. (R. at 981.)

Plaintiff reported pending physical concerns and some anger relative to social situations on April 28, 2016. (R. at 983.) On May 19, 2016, Plaintiff reported managing his emotions well and Dr. Scrimenti noted Plaintiff was using appropriate skills to deal with a variety of situations. (R. at 985.) Plaintiff reported overall healthy control over his emotions on August 25, 2016. (R. at 1065.) On September 22, 2016, Plaintiff reported healthy management of his emotions in the context of mental health and physical health. (R. at 1069.) On October 6, 2016, Dr. Scrimenti noted that Plaintiff continued to hone his emotional management skills to create stability. (R. at 1073.) Plaintiff reported fluctuating emotional management especially related to tiredness due to medications and physical issues on October 20, 2016. (R. at 1077.) On December 15, 2016, Plaintiff reported recent physical health issues and related emotional/mood lability. (R. at 1079.)

Dr. Scrimenti completed a "Mental Residual Functional Capacity Questionnaire" about Plaintiff on December 16, 2016. (R. at 1038–42.) Dr. Scrimenti included the following clinical findings as demonstrative of Plaintiff's severity in his mental impairment and symptoms: fluctuating concentration and attention span, depression, and anxiety. (R. at 1038.) Dr. Scrimenti indicated that Plaintiff's prognosis was "good" and that Plaintiff had a "good response" to therapy. (*Id.*) Dr. Scrimenti found that Plaintiff would miss more than four days per month at work because of his impairments or treatment. (R. at 1041.)

### 2. Steven Meyer, Ph.D.[2]

Dr. Meyer evaluated Plaintiff for disability purposes on June 25, 2014. (R. at 532–36.) Plaintiff reported that he was applying for disability benefits due to physical problems including liver disease, hypertension, high iron, and hepatitis C. (R. at 532.) Plaintiff further reported that he has never been involved in outpatient counseling or been administered psychological testing. (R. at 533.) Furthermore, Plaintiff reported that he has never attempted suicide or had a nervous breakdown, and never been prescribed medications for mental health problems. (R. at 533.) Regarding his activities of daily living, Plaintiff reported that he gets up between 8:00 AM and 10:00 AM, makes breakfast, takes medication ,watches the news, tries to do things around the house, sometimes takes a walk, spends time with his wife, may go for a drive, read his mail, and write lists. (R. at 533–34.)

Dr. Meyer found that Plaintiff's grooming was clean, but unkempt. (R. at 534.) Dr. Meyer further found that Plaintiff presented as tired, sad, and defeated. (*Id.*) Dr. Meyer also found that Plaintiff's eye contact was good, his posture was slumped, his tone of voice was monotone, and his gait was slow. (*Id.*) Dr. Meyer noted that Plaintiff's affect was blunted and his prevailing mood was mildly dysphoric and anxious. (*Id.*) Dr. Meyer also noted that Plaintiff was oriented to person, place, time, and situation. (*Id.*) When Dr. Meyer asked about auditory and visual hallucinations, Plaintiff responded that he sees things move sometimes. (*Id.*)

Dr. Meyer diagnosed Plaintiff with an adjustment disorder with depression and anxiety. (R. at 535.) Dr. Meyer opined that an increase in Plaintiff's physical symptoms would likely increase his psychological distress. (*Id.*) Dr. Meyer further opined that Plaintiff could perform

---

[2] The ALJ refers to Dr. Meyer as "Dr. Howard" in the administrative decision. (*See, e.g.*, R. at 21.) Dr. Meyer practices from Lee Howard, Ph.D. & Assoc. (*See* R. at 532.)

adequately only in a nonsocial, solitary position, with at most intermittent contact with coworkers and supervisors.  (R. at 536.)

### 3.    State Agency Evaluation

State agency psychologist, Paul Tangeman, Ph.D., reviewed the file in August 2014 and found that Plaintiff had mild restrictions in his activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace.  (R. at 81.)  Dr. Tangeman found that Plaintiff's statements regarding symptoms considering the total medical and non-medical evidence in file were partially credible. (R. at 82.)  Dr. Tangeman concluded that Plaintiff was capable of simple one- to two-step tasks, tasks without fast pace, superficial social interactions, and capable of work in a static work environment with infrequent changes.  (R. at 85–86.)

State agency psychologist, Irma Johnston, Psy.D., reviewed the file at the reconsideration level in March 2015 and affirmed Dr. Tangeman's assessment.  (R. at 117–18.)  However, Dr. Johnston's conclusion that Plaintiff was capable of performing tasks in settings without a fast pace, capable of infrequent and superficial social interactions, and capable of work in a static work environment with infrequent changes was slightly different from Dr. Tangeman's conclusion.  (R. at 85–86, 122–23.)

## IV. ADMINISTRATIVE DECISION

On March 31, 2017, the ALJ issued his decision.  (R. at 12–26.)  At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantial

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

gainful activity since January 2, 2014, the alleged onset date.  (R. at 17.)  The ALJ found that

Plaintiff has the following severe impairments: Hepatitis C, thrombocytopenia and

hemochromatosis; cirrhosis; chronic kidney disease with stenting; non-alcoholic steato[hepatitis]

(NASH); hypertension; coronary artery disease (CAD); adjustment disorder with depression and

anxiety; and impulse control disorder.  (*Id.*)  The ALJ further found that Plaintiff did not have an

impairment or combination of impairments that meets or medically equals the severity of one of

the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 18.)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional

capacity ("RFC") as follows:

> [Plaintiff] has the residual functional capacity to perform light work as defined in
> 20 CFR 404.1567(b) and 416.967(b) except that the [Plaintiff] can never climb
> ladders, ropes or scaffolds but can frequently climb ramps and stairs; and
> occasionally stoop.  The [Plaintiff] must avoid concentrated exposure to extreme
> heat and cold; excessive humidity and wetness; and excessive vibration.  The
> [Plaintiff] must avoid workplace hazards, including unprotected heights and
> machinery.  The [Plaintiff] is limited to simple, routine, repetitive tasks with only
> simple work-related decisions and few, if any, workplace changes.  The [Plaintiff]
> requires work with no strict production quotas or fast pace.  The [Plaintiff] can have
> occasional interaction with coworkers and supervisors; and no interaction with the
> general public.

---

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or
    equal the criteria of an impairment set forth in the Commissioner's Listing of
    Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant
    perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual
    functional capacity, can the claimant perform other work available in the national
    economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster
v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

(R. at 19.)  In making this determination, the ALJ accorded "some weight" to the opinions of the state agency psychologists and consultive examiner, and "little weight" to the opinion of Plaintiff's treating psychologist, Dr. Scrimenti.

Relying on the VE's testimony, the ALJ concluded that Plaintiff is unable to perform any past relevant work.  (R. at 24–25.)  The ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (R. at 25.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act from January 2, 2014, through the date of the administrative decision.  (R. at 26.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

Plaintiff puts forth three assignments of error. First, Plaintiff asserts that the RFC determination is not supported by substantial evidence. (ECF No. 8, at pg. 6.) Second, Plaintiff maintains that the ALJ failed to comply with 20 C.F.R. § 404.1527 and SSR 96-2P[4] by failing to properly evaluate the opinion of Plaintiff's treating physician, Dr. Haggenjos. (*Id.* at 12.) Finally, Plaintiff contends that the ALJ improperly evaluated Plaintiff's credibility under SSR 16-3P. (*Id.* at 17.)

### A.  RFC Determination

Plaintiff first argues that the ALJ's RFC determination is not supported by substantial evidence. (ECF No. 8, at pg. 6–11.) A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a),

---

[4] SSR 96-2P was rescinded by Federal Register Notice Vol. 82, No. 57, pg. 15263 effective March 27, 2017. Here, because Plaintiff's claim was filed prior to the effective date, SSR 96-2P still applies in this case.

416.945(a).  The determination of RFC is an issue reserved to the Commissioner.  20 C.F.R. §§

404.1527(e), 416.927(e).  Nevertheless, substantial evidence must support the Commissioner's

RFC finding.  *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18,

2010).  When considering the medical evidence and calculating the RFC, "'ALJs must not

succumb to the temptation to play doctor and make their own independent medical findings.'"

*Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v.

Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009

WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw

medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he set forth

in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the
> evidence supports each conclusion, citing specific medical facts (e.g., laboratory
> findings) and nonmedical evidence (e.g., daily activities, observations).  In
> assessing RFC, the adjudicator must discuss the individual's ability to perform
> sustained work activities in an ordinary work setting on a regular and continuing
> basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and
> describe the maximum amount of each work-related activity the individual can
> perform based on the evidence available in the case record. The adjudicator must
> also explain how any material inconsistencies or ambiguities in the evidence in the
> case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

Plaintiff asserts that the ALJ's RFC determination is not supported by substantial

evidence.  Again, the ALJ found that Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to perform light work as defined in
> 20 CFR 404.1567(b) and 416.967(b) except that the [Plaintiff] can never climb
> ladders, ropes or scaffolds but can frequently climb ramps and stairs; and
> occasionally stoop.  The [Plaintiff] must avoid concentrated exposure to extreme
> heat and cold; excessive humidity and wetness; and excessive vibration.  The
> [Plaintiff] must avoid workplace hazards, including unprotected heights and
> machinery.  The [Plaintiff] is limited to simple, routine, repetitive tasks with only

simple work-related decisions and few, if any, workplace changes. The [Plaintiff] requires work with no strict production quotas or fast pace. The [Plaintiff] can have occasional interaction with coworkers and supervisors; and no interaction with the general public.

(R. at 19.)

In his efforts to challenge the ALJ's RFC determination, Plaintiff first asserts that "the ALJ failed to provide the requisite 'good reasons' for rejecting Dr. Scrimenti's treating source opinion." (ECF No. 8, at pg. 8.) The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ." 20 C.F.R. § 416.927(c)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the [claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to

any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 f.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, Plaintiff argues that the ALJ only provided "a single 'good reason' for rejecting Dr. Scrimenti's opinion: That Dr. Scrimenti reported that [Plaintiff] had a 'good' response to therapy." (ECF No. 8, at pg. 9.) The ALJ noted the following regarding Dr. Scrimenti's opinion:

The [Plaintiff's] therapist, Dr. Scrimenti, opined that he would miss more than four days a month but then admitted that he had [a] good response to therapy (Exhibit 45F). I give little weight to the opinion of Dr. Scrimenti, as it is inconsistent with the record. I note that Dr. Scrimenti failed to provide any specific reason for his opinion and even admitted that the [Plaintiff] had a good response to therapy. The record shows as well that the [Plaintiff] had improvement in his anger and mood with therapy and medication (Exhibits 28F/5-6, 9-18, 39F/1-10, 41F/2-3, 46F/22-29).

(R. at 24.)

Plaintiff fails to note that the ALJ also provided citations to the record where Plaintiff had demonstrated "improvement in his anger and mood with therapy and medication[,]" in addition to pointing out that Dr. Scrimenti reported Plaintiff had a good response to therapy. (*Id.*) Furthermore, Plaintiff asserts that it is improper for the ALJ to use part of Dr. Scrimenti's opinion (that Plaintiff had a "good response" to therapy) to discredit another part of Dr. Scrimenti's opinion (that Plaintiff would miss more than four days of work per month). (ECF No. 8, at pg. 9.) However, an ALJ may properly discount a treating physician's opinion when it is not supported by the physician's own treatment notes. *See Lucas v. Comm'r of Soc. Sec.*, No. 1:09-cv-920, 2010 WL 2992394, at * 6 (W.D. Mich. July 6, 2010) (finding that an ALJ properly rejected a doctor's restrictions when they were inconsistent with the doctor's own treatment notes and the opinions of other physicians).

Dr. Scrimenti reported that Plaintiff had a good response to therapy in the Mental Residual Functional Capacity Questionnaire he completed regarding Plaintiff on December 16, 2016. (R. at 1038–42.) Substantial evidence supports this conclusion that Plaintiff had demonstrated improvement in his anger and mood with therapy and medication. (*See, e.g.*, R. at 727; ("[Plaintiff] reported that Celexa medication has been beneficial – increased sleep and less anger."); 731 ("[Plaintiff] reported no problems with anger since our last session."); 737 ("[Plaintiff] reported no major problems with anger, depression, or anxiety."); 964 ("[Plaintiff]

has been controlling his anger[.]"); 970 ("[Plaintiff] continues to manage his moods and anger relatively well."); 1063 ("[Plaintiff] reported relatively manageable anger and depression."); 1065 ("[Plaintiff] reported overall healthy control over his emotions."); 1069 ("[Plaintiff] reported healthy management of his emotions in the context of mental health and his physical (liver and kidney) needs.").); *see also Lucas*, 2010 WL 2992394 at *4 ("A treating physician's opinion is not entitled to controlling weight where it is . . . inconsistent with the other substantial evidence in [the] case record.").

"Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion." *Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175–76 (6th Cir. 2009) (citations omitted). Here, substantial evidence supports the ALJ's determination that Dr. Scrimenti's opinion that Plaintiff would miss more than four days of work per month was inconsistent with other medical evidence in the record.

Plaintiff also argues that "the RFC does not adequately address [his] continued problems with concentration, persistence, ability to respond to changes and ability to perform activities within a schedule, without additional rest periods." (ECF No. 8, at pg. 10.) Specifically, Plaintiff asserts that the ALJ's limitations of "simple, routine, repetitive tasks with only simple work-related decisions and few, if any, workplace changes . . . [and] work with no strict production quotas or fast pace" are insufficient because they "do not fully convey [Plaintiff's] limitations in concentration and pace to the vocational expert." (*Id.*) The ALJ made the following findings regarding Plaintiff's limitations:

> In particular, the [Plaintiff] is limited to simple, repetitive tasks because of some issues concentrating related to his adjustment disorder (Hearing Testimony). The [Plaintiff] needs work without a fast pace because of some increased symptoms of his adjustment disorder in stressful situations (Exhibit 13F). The [Plaintiff] also

has some social limitations due to some anger issues related to his impulse control disorder (Exhibits 13F, 27F, 28F/2, Hearing Testimony).

(R. at 24.)  Plaintiff, however, asserts that the record "consistently documents [Plaintiff's] impairments in concentration, persistence, and pace."  (ECF No. 8, at pg. 10–11.)  Plaintiff, therefore, takes issue with the hypothetical question the ALJ provided to the VE in the hearing, asserting that it "is not adequate on the issue of moderate limitations of concentration, persistence, and pace[.]"  (*Id.* at 11.)

Plaintiff points to the opinions of the state agency psychologists who found that he had moderate difficulties in maintaining concentration, persistence, and pace.  (ECF No. 8, at pg. 4; R. at 81, 117–18.)  Furthermore, at the initial level, state agency psychologist Dr. Tangeman concluded that Plaintiff was capable of simple one- to two-step tasks, tasks without fast pace, superficial social interactions, and capable of work in a static work environment with infrequent changes.  (R. at 85–86.)  At the reconsideration level, state agency psychologist Dr. Johnston concluded that Plaintiff was capable of performing tasks in settings without a fast pace, capable of infrequent and superficial social interactions, and capable of work in a static work environment with infrequent changes.  (R. at 122–23.)  Initially, Plaintiff indicates that the ALJ accorded "some weight" to the opinions of the state agency psychologists.  (ECF No. 8, at pg. 7.)  This statement is correct.  (R. at 24 ("I give some weight to the opinions of the State agency psychological consultants, as they are generally consistent with the record.").)  Plaintiff, however, later argues that the "ALJ accorded *great weight* to the opinion of the State agency psychologists but failed to incorporate all of the limitations set forth by these medical sources." (ECF No. 8, at pg. 11. (emphasis added).)

The ALJ did not give controlling weight to any opinion regarding how Plaintiff's levels of concentration, persistence, or pace should be quantified in the RFC determination, including

Dr. Meyer's opinions, to which the ALJ accorded "some weight." (R. at 23–24.) Indeed, the determination of a plaintiff's RFC is entirely within the purview of the ALJ, and "this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Moreover, the ALJ did not ignore Plaintiff's difficulties with concentration, persistence, or pace. As noted above, the ALJ specifically considered Plaintiff's adjustment disorder, noting the increased symptoms during stressful situations, and Plaintiff's social limitations stemming from anger issues and his impulse control disorder. (*See* R. at 24.) In coming to this conclusion, the ALJ reviewed the evidence put forth by the state agency psychological consultants and Dr. Meyer, declining to afford any of the opinions great or controlling weight. (*Id.*)

Plaintiff fails to cite to any meaningful case law in support of his argument. Plaintiff's only citation is to *Schalk v. Comm'r of Soc. Sec.*, No. 10-13894, 2011 WL 4406824, at *11 (E.D. Mich. August 30, 2011), *report and recommendation adopted*, No. 10-13894, 2011 WL 4406332 (E.D. Mich. Sept. 22, 2011). (ECF No. 8, at pg. 11.) Plaintiff cites to this case in support of the assertion that "[w]hile, 'there is no bright-line rule' as to how an ALJ should incorporate moderate concentration, persistence, and pace limitations into her hypothetical questions to the vocational expert and, ultimately, the RFC, the Court does require that the RFC be supported by substantial evidence[.]" (*Id.*) However, that is not precisely what *Schalk* holds.

Instead, the court in *Schalk* found that "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC." 2011 WL 4406824, at *11. In the instant case, the ALJ's RFC determination did not include a limitation of unskilled work. (R. at

19.)  It did, however, include a limitation to "simple, routine, repetitive tasks[.]"  (*Id.*)  While "[t]here may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks[, plaintiff does not] explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace."  *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010).  Plaintiff in the instant case also fails to explain why the facts of his case require a more detailed hypothetical question.  Rather, Plaintiff simply points to evidence in the record that he believes demonstrates his limitations in concentration, persistence, and pace.  (ECF No. 8, at pg. 7–11.)  The Undersigned finds that, reviewing the record as a whole, substantial evidence demonstrates that the ALJ's RFC adequately accounted for all of the limitations he found credible.  It is therefore **RECOMMENDED** that Plaintiff's contention of error based on the ALJ's RFC determination be **OVERRULED**.

### B.  Treating Physician Opinion

Plaintiff next argues that the ALJ failed to properly evaluate the opinion of Dr. Haggenjos, Plaintiff's treating physician.  (ECF No. 8, at pg. 12–16.)  In evaluating a claimant's case, the ALJ must consider all medical opinions that he or she receives.  20 C.F.R. § 416.927(c).  Medical opinions include any "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).[5]

---

[5] The Court has already discussed the proper analysis of a treating physician's opinion and will not repeat it here.

Here, Plaintiff asserts that the ALJ failed to properly evaluate the medical opinions of his treating physician, Dr. Haggenjos. (ECF No. 8, at pg. 12–16.) Specifically, Plaintiff asserts that the ALJ erred in not assigning controlling weight to the opinions of Dr. Haggenjos. (*Id.* at 12.) The ALJ assigned "little weight" to the June 2014 opinion of Dr. Haggenjos that Plaintiff could not work. (R. at 23.) The ALJ reasoned that "Dr. Haggenjos failed to provide any specific limitations and a finding of disability is reserved to the Commissioner." (R. at 23–24.) The ALJ assigned "little weight" to the October 2014 opinion of Dr. Haggenjos that Plaintiff could perform sedentary work but would need to lie down at times and would miss more than four days of work. (R. at 24.) The ALJ found that the October 2014 opinion was "inconsistent with the record. Specifically, [Plaintiff] does not require further standing or walking limitations or would need to lie down as he noted improvement in his fatigue with medication. [Plaintiff] would not miss work, as he had improvement in his abdominal pain as well." (*Id.*)

As an initial matter, the ALJ properly rejected Dr. Haggenjos' June 2014 opinion that Plaintiff could not work. 20 C.F.R. § 404.1527(d)(1) provides that "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the ALJ] will determine you are disabled." Furthermore, 20 C.F.R. § 404.1527(d)(3) states that the ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." The June 2014 opinion that Plaintiff could not work is, therefore, not a medical opinion as described in the regulations. Instead, it is an opinion on an issue reserved to the Commissioner, which is not entitled to controlling weight. 20 C.F.R. § 404.1527(d)(1), (3); *see Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (holding that the ALJ properly rejected a treating source's opinion that the claimant was disabled because such a determination was reserved to the

Commissioner); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (concluding that the opinion "is not a medical opinion requiring consideration.").

Regarding Dr. Haggenjos' October 2014 opinion, the ALJ found it inconsistent with other evidence in the record. (*See* R. at 24.) Substantial evidence supports the ALJ's assignment of "little weight" to the October 2014 opinion. Specifically, improvements in Plaintiff's condition undermined the limitations in Dr. Haggenjos' opinion. For example, Plaintiff's energy levels had improved with medication. (*See, e.g.*, R. at 747, ("[Plaintiff] stated he started the Celexa one month ago, and has noticed a small difference[.]"); 992 ("[Plaintiff] feels less depressed and has more energy. Of note, he's been taking Harvoni, so I'm sure this has been helpful in energy level in that regard over the past 90 days."); 1001 ("[Plaintiff is] still improving with completing Harvoni treatment . . . overall [he] is faring better – some more energy.").) Additionally, Plaintiff had experienced other overall improvements besides his energy level, including an improvement in his abdominal pain. (*See, e.g.*, R. at 931 ("[Plaintiff] reports doing very well. He has not gained anymore weight. He does not believe he had an increase in swelling. He denies any confusion, melena, hematochezia, nausea, vomiting, [or] abdominal pain."); 977 ("[Plaintiff] denies any current fevers, unexpected weight loss, chest pain, shortness of breath, nausea, vomiting, abdominal pain, diarrhea, constipation, melena, [or] hematochezia.").)

"Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion." *Price*, 342 F. App'x at 175–76 (citations omitted). Here, the opinions of Dr. Haggenjos are inconsistent with a variety of other medical evidence in the record. Plaintiff argues that the ALJ erred, however, because the opinions of Dr. Haggenjos

were supported by information in the medical record and that the ALJ simply "cherry-picked" portions of the record while disregarding other portions. (ECF No. 8, at pg. 14.) An ALJ is not required to address every piece of evidence in his or her opinion. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (quoting *Loral Defense-Systems—Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Nonetheless, here the ALJ did discuss much of the evidence Plaintiff cites as supporting the opinions of Dr. Haggenjos, including Plaintiff's acute renal failure, edema, cirrhosis, swelling in his legs, iron levels, hemochromatosis, and fatigue. (R. at 21–22; *see* ECF No. 8, at pg. 14.) Notably, the Court will defer to the ALJ's decision if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (quoting *Key*, 109 F.3d at 273).

Furthermore, the "ALJ must give a treating physician's opinion controlling weight only if the opinion relies on objective medical findings, . . . and substantial evidence does not contradict it . . . . If the ALJ finds the treating physician's opinion fails to meet these two conditions, he may discredit that opinion so long as he communicates a reasoned basis for doing so." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 441 (6th Cir. 2010) (citations omitted). Here, the ALJ provided a reasoned basis for not giving the June 2014 and October 2014 opinions of Dr. Haggenjos controlling weight. It is therefore **RECOMMENDED** that Plaintiff's contention of error based on the ALJ's evaluation of the opinions of Dr. Haggenjos be **OVERRULED**.

### C. Plaintiff's Credibility

Finally, Plaintiff challenges the ALJ's credibility finding, asserting that it is not based on substantial evidence. (ECF No. 8, at pg. 17–18.) The Court of Appeals for the Sixth Circuit has provided the following guidance in considering an ALJ's credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.*

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir.1987)).

Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted). An ALJ's explanation of his or her credibility decision "must be

sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029 (March 2016)[6]; *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted). The Sixth Circuit has held that "even if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial evidence remains to support it." *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)).

Here, the ALJ concluded that the some limiting effects of Plaintiff's symptoms were not credible to the extent that they were inconsistent with the medical evidence:

---

[6] SSR 16-3p, which became effective in March 2016, superceded and rescinded SSR 96-7p. *See* SSR 16-3p, 2016 WL 1119029, at *1 (March 2016).

After careful consideration of the evidence, I find that the [Plaintiff's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. As for activities of daily living, the [Plaintiff] stated in the Function Report that he could not do anything other than use a riding lawnmower to cut his grass (Exhibit 4E). Yet, the [Plaintiff] indicated at the consultative psychological examination that he tried to do things around the house. The [Plaintiff] also noted that he tried to take long walks (Exhibit 13F). The [Plaintiff] stated as well in June 2014 that he walked for exercise (Exhibit 11F). As for course of treatment, the [Plaintiff] testified that he has trouble lifting and carrying objects because of cramping in his hands (Hearing Testimony). The record does not show any specific issues with his hands or complaints of the same. The [Plaintiff] mentioned in May 2014 and February 2015 that he had some swelling in his legs but there is otherwise no mention of it (Exhibits 9F, 20F/1-4). There is also no recommendation that the [Plaintiff] elevate his legs. The [Plaintiff] then testified that he has vomiting episodes that occur around every 2 months or so during which he is done for as much as a week (Hearing Testimony). The [Plaintiff] complained of some abdominal pain in April 2014 but it stabilized during his hospital stay (Exhibit 6F). In September 2014, the [Plaintiff] had abdominal pain but it again decreased during his hospital stay (Exhibit 17F). The [Plaintiff] stated in October 2014 that he had abdominal pain but he then denied any pain at subsequent visits in May 2015 and March 2016 to Dr. Peck and Dr. Michaels (Exhibits 20F/4-7, 35F/4-7, 40F). At the hearing, the [Plaintiff] testified that he suffers from fatigue due to his liver (Hearing Testimony). The record shows some fatigue in September and October 2015 due to hepatic failure and medication (Exhibits 28F/15-16, 29F/10-19). However, the [Plaintiff] then indicated in November 2015 that he had more energy (Exhibit 29F/20-29). The [Plaintiff] reiterated in February and May 2016 that the medication helped with his energy level (Exhibits 31F/22-31, 41F/13-21). As for the [Plaintiff's] mental impairments, he testified that he has issues with his anger (Hearing Testimony). Yet, the [Plaintiff] stated on multiple occasions that his anger was under control with therapy and medication (Exhibits 28F/5-6, 9-18, 39F/1-10, 41F/2-3, 46F/22-29). At the hearing, the [Plaintiff] stated that he has issues with concentration but Mr. DiSalvo continuously found that the [Plaintiff] had normal concentration (Exhibits 29F/1-29, 31F/22-31, 41F/13-21, 46F/2-11).

(R. at 22–23.)

The only part of the ALJ's conclusion regarding Plaintiff's credibility with which Plaintiff appears to take issue is the ALJ's reliance on a statement in the record about Plaintiff's energy. (*See* ECF No. 8, at pg. 17 ("[T]he ALJ relied on a cursory statement in the record that indicated that [Plaintiff] has 'more energy' to discount his testimony as to the severity of his

fatigue, caused by [hepatic] failure and medication.").)  Plaintiff asserts that because the record

actually indicates "[plaintiff] has sl. more energy, not much (mostly due to his hepatic failure)[,]"

the ALJ's statement about "more energy" is inaccurate, given that the record states "slightly

more energy."  (*Id.* at 17–18.)  Plaintiff argues that the statement regarding energy "should not

negate the consistent records documenting [Plaintiff's] significant limitations[.]"  (*Id.*)

 Even if the Undersigned agreed with Plaintiff's argument in this regard, the ALJ provided

numerous other justifications for his credibility finding.  The Undersigned finds that the ALJ's

detailed discussion amply supplies substantial evidence supporting his credibility finding and

that he properly considered the requisite factors in assessing Plaintiff's allegations of limiting

effects of his symptoms.  For example, the ALJ included a lengthy and thorough discussion of

the record evidence, including the objective medical findings.  *See* 20 C.F.R. § 404.1529(c)(2)

(objective medical findings are useful in assessing the intensity and persistence of a claimant's

symptoms).  The record supports the ALJ's finding in this regard.  Plaintiff discussed hand

cramping during the hearing, but the record contains no evidence of any specific issues with

Plaintiff's hands or that he made similar complaints to his medical providers.  (R. at 65–66.)

Furthermore, while Plaintiff occasionally complained of abdominal pain, he also denied any

abdominal pain during medical appointments.  (*See* R. at 373, 397, 472 481–82; *but see* 653,

671, 931, 977.)

 Moreover, the ALJ also reasonably considered the record evidence reflecting Plaintiff's

activities of daily living.  *See* 20 C.F.R. § 404.1529(c)(3)(i) (daily activities may be useful to

assess nature and severity of claimant's symptoms); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d

387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [the claimant's]

ability to conduct daily life activities in the face of his claim of disabling pain.").  The record

supports the ALJ's finding in this regard. For example, during the hearing, Plaintiff testified that his typical day consists of napping and watching television. (R. at 63–64.) However, Plaintiff reported to Dr. Meyer that his typical day may consist of waking up between 8:00 AM and 10:00 AM, making breakfast, watching television, trying to do things around the house, taking a walk, and going for a drive, among other activities. (R. at 533–34.)

In sum, the Undersigned finds that the ALJ's assessment of Plaintiff's credibility was based on consideration of the entire record and is supported by substantial evidence. Accordingly, applying the applicable deferential standard of review, the Court concludes that the ALJ's credibility determination was not erroneous. It is therefore **RECOMMENDED** that Plaintiff's contention of error based on the ALJ's consideration of his subjective complaints be **OVERRULED**.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 18, 2019                    */s/ Elizabeth A. Preston Deavers*_____
                                        **ELIZABETH A. PRESTON DEAVERS**
                                        **CHIEF UNITED STATES MAGISTRATE JUDGE**